618 F.2d 232
 Orville E. SPICER, Appellant,
v.
Gary J. HILTON, Dr. Charles Dugann, E. Calvin Neubert,
Donald Tucker, G. DePaolis, J. L. Williams,
Individually and in their official
capacities, and the State of
New Jersey, Appellees.
 No. 79-1996.
 United States Court of Appeals, Third Circuit.
 Argued Nov. 13, 1979.
Decided Feb. 28, 1980.
 
 William E. Staehle (argued), Sweeney, Bozonelis, Staehle & Woodward, Chatham, N. J., for appellant.
 John J. Degnan, Atty. Gen. of New Jersey, George W. Fisher (argued), Deputy Atty. Gen., Erminie L. Conley, Asst. Atty. Gen., Trenton, N. J., of counsel, for appellees.
 Before GIBBONS, HIGGINBOTHAM and SLOVITER, Circuit Judges.
 OPINION OF THE COURT
 SLOVITER, Circuit Judge.
 
 I.
 
 1
 This appeal has been filed by a New Jersey state prisoner from the denial by the trial court of an injunction that would require the state to provide him with specialized medical treatment necessitated in part by mistreatment and inaction of state officials. The district court held that the requested relief was barred by the Eleventh Amendment.
 
 
 2
 We are urged by appellant to make the first judicial determination that the Eleventh Amendment does not immunize a state from federal suit brought on a cause of action arising directly under the Fourteenth Amendment and seeking prospective injunctive relief. Alternatively appellant asks us to remand to the district court so that plaintiff may sue the proper responsible state official in his/her representative capacity in order to achieve the requested injunctive relief.II.
 
 Facts
 
 3
 The underlying facts in this case present a deplorable picture of the serious effects which can attend indifference to and disregard of a prisoner's medical needs. Appellant, a prisoner at Trenton State Prison (TSP) from June 1971 until August 1977, evinced circulatory problems in his left leg in October 1971. At least by August 1974 the symptoms indicated chronic arterial insufficiency of the lower legs, heels and feet, primarily on the left side. "Treatment during this period was neither consistent with vascular disease nor especially beneficial to plaintiff's condition." (All material in quotations in this section is from findings of the trial court.)
 
 
 4
 In September 1975 a podiatrist prescribed a pair of soft leather Wellington boots which alleviated appellant's problems to some degree, and which were found to have been appropriate therapy for his condition. In December 1975, a vascular surgeon recommended that an arteriogram be performed because an examination indicated the likelihood that appellant suffered from vascular disease of an advanced degree. The medical director of the prison hospital failed to authorize an arteriogram.
 
 
 5
 On October 18, 1976, a prison guard confiscated appellant's boots because they were ten inches tall and exceeded the six-inch height limit for inmates' footwear, although appellant advised the guard that the boots were medically prescribed and that appellant had no other footwear except socks. The shoes offered to appellant as a replacement a week to ten days later did not fit, and appellant thereafter wore socks, went barefoot, or wore very thin foam rubber slippers furnished by the prison "which wore out rapidly on the cold concrete and steel floors" while he walked the three blocks distance to work.
 
 
 6
 When appellant's boots were returned on November 8, 1976, they were shortened to conform with the six-inch height regulation, but in that condition rubbed his shins as he walked, creating gouges or sores. Because of the abrasive effect on his lower extremity, he discontinued wearing them. Eleven months after the vascular surgeon had recommended an arteriogram, one was arranged, but even then only because appellant had discovered the physician's letter and confronted the medical director with it. The arteriogram performed on November 23, 1976, was followed by a left lumbar sympathectomy in order to increase the blood flow to the affected area. This operation was moderately successful, but appellant's circulatory problems intensified upon his return to TSP, primarily because he had developed wet gangrene of the little toe on his left foot. "The seizure of the boots, and the failure of the prison administration to provide adequate alternative footwear at any time after October 18, 1976, thereby exposing plaintiff's left lower extremity to extreme cold, was a substantial factor in the deterioration of his condition."
 
 
 7
 As a result of the wet gangrene, appellant was subjected to four progressive amputations of his left foot beginning in January 1977 culminating in a transmetatarsal amputation of his left foot in July 1977. Among the factors which necessitated the multiple operations was "the inadequacy of the medical care plaintiff received upon his return to the prison hospital after each operation," such as being required to walk on his fresh wound without a wheelchair and with only the aid of crutches. In August 1977 appellant was transferred to Clinton Correctional Institute (Clinton).
 
 
 8
 While at TSP, and even before the amputations, appellant filed a pro se action on October 26, 1976 against prison officials, alleging a violation of his Eighth and Fourteenth Amendment rights due to failure to receive adequate medical treatment. After a year of fruitless preliminary proceedings, appellant requested and was assigned private counsel on January 18, 1978. On March 15, 1978 an amended complaint was filed, which added a second count and New Jersey as a defendant.
 
 
 9
 The complaint contained two federal counts and two common law counts. The first federal count, brought pursuant to 28 U.S.C. § 1343 and 42 U.S.C. § 1983, alleged that plaintiff was subjected to cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments of the United States Constitution. The second count, at issue here, seeks relief against the State of New Jersey alone and is based directly on the Fourteenth Amendment; jurisdiction is predicated on 28 U.S.C. § 1331.
 
 
 10
 After a three day trial without a jury, on February 8, 1979 the court entered Finding of Facts and Conclusions of Law holding that appellant had proven a deprivation of his constitutional rights by one of the individual defendants, Williams, a prison guard, acting under color of state law. The Court found that "(s)eizure of the boots, which was done intentionally and with knowledge of the role they played in Spicer's medical care, denied him a prescribed course of treatment for a serious medical problem. Williams' conscious act violated plaintiff's Eighth Amendment right to be free of cruel and unusual punishment and renders him liable under § 1983." The court considered that appellant did have a pre-existing physical condition which contributed in part to the extent and gravity of his injury, and therefore assessed damages in favor of plaintiff and against defendant Williams on Count I of the complaint to be $50,000 which included compensation for temporary and permanent disability and severe pain and suffering. The court found that plaintiff had not proven the requisite knowledge and deliberateness as to the other individual defendants.
 
 
 11
 On the basis of these findings the court, on February 22, 1979, entered judgment in favor of plaintiff against defendant Williams in the amount of $50,000 and awarded plaintiff attorney's fees and costs of $13,196.15 against the defendant State of New Jersey. The monetary awards have been paid by the State of New Jersey. The court dismissed Count I against all other defendants and dismissed all state law claims against all of the defendants. The order retained jurisdiction and reserved decision on plaintiff's second count against the State of New Jersey alleging an action directly under the Fourteenth Amendment.
 
 
 12
 The open question of New Jersey's liability directly under the Fourteenth Amendment to provide plaintiff with specialized medical care was the subject of a prior order of February 15, 1979, in which the court noted "that this issue may be settled by negotiation of the parties" and therefore ordered that the Clerk of the Court should administratively terminate the action on his records subject to the right of the parties to reopen the action within sixty days, at which time the court undertook to render a decision on that issue.
 
 
 13
 On April 16, 1979, plaintiff, pursuant to Fed.R.Civ.P. 60(b), moved for an order reopening the action. Pursuant to Count II, plaintiff sought an injunction directing the state to provide him with needed medical treatment. The trial court, in an opinion filed May 30, 1979, followed by an Order of June 4, 1979, dismissed this remaining count. Relying on Supreme Court pronouncements upholding the "continued vitality" of the Eleventh Amendment, the court held that a suit for prospective injunctive relief brought directly under the Fourteenth Amendment and naming the state as a defendant is barred by the Eleventh Amendment. It is this novel question that appellant would have us decide.
 
 III.
 Discussion
 
 14
 Any step through the looking glass of the Eleventh Amendment leads to a wonderland of judicially created and perpetuated fiction and paradox. It was adopted in 1798 as a consequence of the decision in Chisolm v. Georgia, 2 U.S. (2 Dall.) 419, 1 L.Ed. 440 (1793), sustaining a money judgment against the state of Georgia by an out-of-state creditor. Its explicit language covering only suits commenced or prosecuted against a state by citizens of another state or country[1] has been extended to protect a state from suits brought by its own citizens as well. Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). It does not preclude suit against a state by the United States, Employees of the Department v. Department of Public Health & Welfare, 411 U.S. 279, 286, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973); United States v. Mississippi, 380 U.S. 128, 140-41, 85 S.Ct. 808, 13 L.Ed.2d 717 (1965), nor a suit against a state by another state, even when the requested relief is for a monetary judgment. South Dakota v. North Carolina, 192 U.S. 286, 315-21, 24 S.Ct. 269, 48 L.Ed. 448 (1904).
 
 
 15
 Although scholarly debate on the origins and scope of the Eleventh Amendment still rages,[2] it is undisputed that the Amendment operates to bar award of a monetary judgment directly against the state, Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); Ford Motor Co. v. Department of Treasury, 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945). This court has read the Edelman decision as closing the door on any money award from the state treasury, whether the claim arises under state law, under federal law made binding upon the states by virtue of the supremacy clause, or under the Fourteenth Amendment directly. Skehan v. Board of Trustees of Bloomsburg State College, 501 F.2d 31, 42-43 n.7 (1974), vacated and remanded on other grounds, 421 U.S. 983, 95 S.Ct. 1986, 44 L.Ed.2d 474 (1975); accord, O'Neill v. Pennsylvania, 459 F.2d 1 (3d Cir. 1972) (per curiam).
 
 
 16
 At the same time, "damages against individual defendants are a permissible remedy in some circumstances notwithstanding the fact that they hold public office. Myers v. Anderson, 238 U.S. 368, 35 S.Ct. 932, 59 L.Ed. 1349 (1915). See generally Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); Moor v. County of Alameda, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973)." Scheuer v. Rhodes, 416 U.S. 232, 238, 94 S.Ct. 1683, 1687, 40 L.Ed.2d 90 (1974). However, a monetary award indistinguishable from one against the state itself is prohibited by the Eleventh Amendment even when the suit is filed against nominal state officials. Edelman v. Jordan, supra.
 
 
 17
 Suits for injunctive relief stand on an entirely different footing. In an unbroken line of authority extending back over 70 years, prospective equitable relief has been issued where state officials were the nominal defendants although in fact the states were the real parties in interest. Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); accord, Quern v. Jordan, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979); Vecchione v. Wohlgemuth, 558 F.2d 150, 156 (3d Cir.), cert. denied, Beal v. Vecchione, 434 U.S. 943, 98 S.Ct. 439, 54 L.Ed.2d 304 (1977) ("We recognize that for eleventh amendment purposes the Ex parte Young type suit is a legal fiction, and that as a practical matter the . . . injunction (does) bind the Commonwealth."); Rochester v. White, 503 F.2d 263 (3d Cir. 1974); Savage v. Pennsylvania, 475 F.Supp. 524 (E.D.Pa.1979).
 
 
 18
 This court recently noted the distinction between equitable and monetary relief under the Eleventh Amendment. In Halderman v. Pennhurst State School & Hospital, 612 F.2d 84 (3d Cir. 1979), we rejected the contention of the Commonwealth defendants that the Eleventh Amendment barred the prospective relief ordered because it would entail the expenditure of Commonwealth funds. We stated there:
 
 
 19
 All of the relief ordered here is prospective. We have told the Commonwealth before that (Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)) "quite explicitly left intact the authority of federal courts to enter prospective decrees having fiscal consequences to a state treasury as the necessary result of compliance." Vecchione v. Wohlgemuth, 558 F.2d 150, 158 (3d Cir.), cert. denied, Beal v. Vecchione, 434 U.S. 943, 98 S.Ct. 439, 54 L.Ed.2d 304 (1977). We have not changed our minds on that question.
 
 
 20
 At 109. Last year, the Court in Quern v. Jordan, supra, held that a federal court could order state officials to mail notice to class members regarding their potential entitlement to past welfare benefits. Because the relief was "properly viewed as ancillary to the prospective relief already ordered by the court", 440 U.S. at 349, 99 S.Ct. at 1149, it was not barred by the Eleventh Amendment.
 
 
 21
 The following language by the Court in that case is of particular significance to the claim sub judice :
 
 
 22
 The distinction between that relief permissible under the doctrine of Ex parte Young and that found barred in Edelman was the difference between prospective relief on one hand and retrospective relief on the other.
 
 
 23
 Id. at 337, 99 S.Ct. at 1143 (footnote omitted).
 
 
 24
 We are asked to end the legal fiction of Ex parte Young and to hold that federal courts may entertain suits brought under the Fourteenth Amendment seeking prospective injunctive relief directly from the states. We note that this contention has been rejected in the context of suits brought under section 1983. In Alabama v. Pugh, 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978) (per curiam), prison inmates in an action filed pursuant to 42 U.S.C. § 1983 succeeded in obtaining an injunction against the state of Alabama, the Alabama Board of Corrections, and several prison officials prescribing measures to eradicate cruel and unusual punishment in the Alabama prison system. Although the injunction was concededly proper as to all of the other parties, the Supreme Court held its issuance against the state and Board of Corrections was barred by the Eleventh Amendment unless Alabama consented to the filing of the suit. The decision the following year in Quern v. Jordan sustaining injunctive relief when state officers were the named defendants made it apparent that the distinction between suits directly against the state and those against its officials would continue to be maintained in equitable actions as well as damage actions.
 
 
 25
 Thus, were the requested relief of specialized medical care directed to appropriate state officials, rather than the state eo nomine, the district court would be free to entertain it, and there is ample basis in the record on which such an injunction could be found appropriate. In its opinion of February 8, 1979, after the amputations and after appellant had been transferred from TSP, the court found:
 
 
 26
 Plaintiff has not been receiving medical treatment for his acute vascular insufficiency, which still poses grave problems to his health. Spicer should be seen by a vascular specialist every three months, and a physiatrist should be employed to design an appropriate appliance for his stump.
 
 
 27
 In its later opinion of May 30, 1979, the court again noted: "Were a responsible state official a named defendant, a legitimate ground for the requested injunction would be to insure that no unconstitutional conduct occurred in the future."[3]
 
 
 28
 Appellant contends that this claim can be brought directly against the state notwithstanding Alabama v. Pugh, because this count arises directly under the Fourteenth Amendment. In Alabama v. Pugh the suit was brought pursuant to 42 U.S.C. § 1983 and the Court was bound by its earlier decision in Edelman v. Jordan that Congress did not intend, by the passage of section 1983, to sweep away the immunity of the states, a holding reaffirmed last term in Quern v. Jordan, 440 U.S. at 341, 99 S.Ct. 1139, 59 L.Ed.2d 358. At the same time, the majority opinion in Quern v. Jordan recognized that Congress has the power to deprive the states of their immunity, if the intent to do so can be divined:
 
 
 29
 In Fitzpatrick v. Bitzer, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614, the Court found present in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., the "threshold fact of congressional authorization" to sue the State as employer, because the statute made explicit reference to the availability of a private action against state and local governments in the event of the Equal Employment Opportunity Commission or the Attorney General failed to bring suit or effect a conciliation agreement. 427 U.S. at 448 n. 1, 449 n. 2, 452, 96 S.Ct. at 2667 n. 1; . . . In Hutto v. Finney, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522, decided just last Term, the Court held that in enacting the Civil Rights Attorney's Fees Award Act of 1976, 42 U.S.C. § 1988, Congress intended to override the Eleventh Amendment immunity of the States and authorize fee awards payable by the States when their officials are sued in their official capacities. 437 U.S., at 693-694, 98 S.Ct. at 2575-76.
 
 
 30
 Id. at 344, 99 S.Ct. at 1147. Therefore, holdings that Congress can abrogate the states' Eleventh Amendment immunity with legislation enforcing the Fourteenth Amendment may harbinge the conclusion that the states themselves, in ratifying the Fourteenth Amendment, surrendered their Eleventh Amendment sovereign immunity from suits filed directly under the Fourteenth Amendment[4] and which seek merely prospective relief.[5] In view of our disposition of this appeal on another basis, we need not intimate any view of this contention, except to note that it cannot be summarily rejected. See Nowak, The Scope of Congressional Power to Create Causes of Action Against State Governments and the History of the Eleventh and Fourteenth Amendments, 75 Colum.L.Rev. 1413, 1455-64 (1975).
 
 
 31
 Thus, the substantiality of the constitutional issue which is raised by the trial court's dismissal of the Count II claim seeking prospective medical care is evident. However, it is well established that courts have a duty to avoid passing upon a constitutional question if the case may be disposed of on some other ground. Hagans v. Lavine, 415 U.S. 528, 543, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974); Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 346-47, 56 S.Ct. 466, 80 L.Ed. 688 (1935) (Brandeis concurring); Burton v. United States, 196 U.S. 283, 295, 25 S.Ct. 243, 49 L.Ed. 482 (1905). The need for a cause of action arising under the Constitution and seeking injunctive relief against the state directly rather than against a responsible state official in his/her representative capacity may at times prove compelling. An instance may arise in which responsibility for the unconstitutional practice is so diffused through a governmental entity that it cannot be attributed to particular individuals. See Levin, The Section 1983 Municipal Immunity Doctrine, 65 Geo.L.J. 1483, 1502 n.76 (1977). That does not appear to be the case here. Appellant can achieve the same relief he seeks under the Fourteenth Amendment if he is permitted to amend his complaint to substitute the proper responsible state official in a suit pursuant to section 1983 seeking prospective injunctive relief. Consequently there are strong policy reasons to be served if this can be accomplished.
 
 IV.
 Disposition
 
 32
 At the oral argument in the trial court on the propriety of issuance of the requested injunction against the state, appellant's counsel suggested that he would be glad to substitute the appropriate state official for the state of New Jersey as defendant in this litigation if the state supplied him with the name of the appropriate official. He also stated that the state has failed to do so on the ground it was "not really sure who the appropriate official would be anyway." No further action was taken to amend the complaint in that regard because the trial court dismissed the action on the Eleventh Amendment basis. In his appeal to this court, appellant has claimed in the alternative that the state should be required to substitute the responsible official against whom relief could issue. At the oral argument in this court, the state's counsel suggested that the Superintendent of the Clinton facility where appellant is presently located or the Commissioner of the Department of Corrections might be appropriate officials to be substituted.
 
 
 33
 We note that no written motion to amend under Rule 15, Fed.R.Civ.Proc. has been filed in this case. Under ordinary circumstances, this court will not remand a case for proceedings which have not been the subject of a prior request. Under the circumstances of this case, such a remand is warranted.[6]
 
 
 34
 As we previously noted, the "general rule, based upon overriding policy considerations, is to avoid constitutional issues unless essential to the decision of a case." Gavin v. Peoples Natural Gas Co., 613 F.2d 482 at 484 (3d Cir. 1980). The compulsion to avoid premature constitutional decisions is so strong that this court has previously held that it supercedes even our customary concern with orderly presentation of issues. In Allen v. Aytch, 535 F.2d 817, 819-20 (3d Cir. 1976), this court remanded a prisoner's civil rights action which had been decided on a constitutional issue in the district court in order that the prisoner could be heard on nonconstitutional issues raised for the first time on appeal. We stated:
 
 
 35
 It is well established that federal courts will not pass upon a constitutional question if the issue presented in a case may be adjudicated on a nonconstitutional ground. (footnote omitted). That is also true where, as here, the nonconstitutional basis for the decision was neither raised in the pleadings nor ruled upon by the lower court. The Supreme Court has on several occasions even applied the doctrine when the nonconstitutional ground was not presented by the parties but was first noticed by the Court itself. (The court referred to Rosenberg v. Fleuti, 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963); Neese v. Southern Railway Co., 350 U.S. 77, 76 S.Ct. 131, 100 L.Ed. 60 (1955) (per curiam); Peters v. Hobby, 349 U.S. 331, 75 S.Ct. 790, 99 L.Ed. 1129 (1955) and Mackey v. Mendoza-Martinez, 362 U.S. 384, 80 S.Ct. 785, 4 L.Ed.2d 812 (1960) (per curiam).)
 
 The court continued:
 
 36
 After oral argument in Mendoza-Martinez, the Court sua sponte asked the parties to brief the nonconstitutional question that would make decision on the constitutional issue unnecessary, and then remanded the case with permission to the parties to amend the pleadings to include the nonconstitutional question. . . .
 
 
 37
 The teaching of these Supreme Court decisions is that we must resolve Allen's appeal by relying on the nonconstitutional claims that he has presented in this Court, even though they were not raised before, if by so doing we may avoid deciding the constitutional questions set forth in his complaint.
 
 
 38
 Id. at 820-21 (footnote omitted).
 
 
 39
 Although we will remand this case for further proceedings to give the appellant an opportunity to make an appropriate request for amendment of the complaint so that the request for an injunction can be heard on the merits, we intimate no view as to whether such an injunction would be proper. The state has argued on appeal that there is no basis for the entry of such an order, particularly now that appellant has been transferred to Clinton. This argument should be addressed to the trial judge who is thoroughly familiar with this case, which he has handled throughout with patience and sensitivity.
 
 
 40
 Finally, we understand that the state has retreated from the position in its brief that the trial court would have no power to direct it to divulge the name of an appropriate official to be substituted as defendant.[7] Appellant's counsel has claimed that appellant's concern about retribution by such an official would be obviated if the name of the defendant were supplied by the state itself. We accept the representation of the state that appellant will not be transferred as a result of this litigation, but in light of the factual findings by the trial court on the underlying claim and the litigation behavior of the Attorney General's office previously adverted to, we believe that the appellant's request that the state be directed to name the appropriate official who could enforce an injunction if one were issued is not unreasonable.
 
 
 41
 For the foregoing reasons the judgment of the district court will be vacated and the cause will be remanded for further proceedings consistent with this opinion.
 
 
 
 [1]
 The Eleventh Amendment provides:
 The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.
 
 
 [2]
 See, e. g., Field, The Eleventh Amendment and Other Sovereign Immunity Doctrines (pts. 1-2), 126 U.Pa.L.Rev. 515, 1203 (1978); Levin, The Section 1983 Municipal Immunity Doctrine, 65 Geo.L.Rev. 1483, 1508-18 (1977); Nowak, The Scope of Congressional Power to Create Causes of Action Against State Governments and the History of the Eleventh and Fourteenth Amendments, 75 Colum.L.Rev. 1413 (1975)
 
 
 [3]
 The physician called as an expert at trial testified with respect to appellant's condition and need for future care:
 It means the arterial circulation is blocked at about, at least the mid leg level. He has normal pulses at the knee. That is a good sign. Traditionally, this disease progresses and he can anticipate further trouble. Right now, the skin is in good condition, and he could go the same for many years without any gangrene requiring amputation. From the description of the arteriogram, when it was done several years ago, he was not what we would call reconstructible. That means taking a synthetic or some other type of vascular conduit and connecting an artery that is normal up in the thigh, down to one in the foot that would supply new blood flow to that artery. He is not amenable to that. So he can anticipate further difficulty, similar to what he has already had.
 Q. In your opinion, Doctor, what treatment should the plaintiff now be receiving?
 A. Well, he should have very careful care of his one good foot and what is left of his left foot. They should be protected from the cold. They should be protected from blood trauma. They should be carefully treated if at any time he develops any skin ulceration, skin breakdown, skin infection, phlebitis, et cetera.
 Q. Doctor, in your opinion, should Mr. Spicer be examined by a vascular specialist?
 A. I think he should be seen by somebody periodically that is cognizant of the potential hazard and the problem that develops in his foot as I alluded to. A skin infection, ingrown toenail, if you don't have adequate arterial circulation, is going to be a definite hazard and it can quickly turn to gangrene and require amputation, so, yes, he should be seen by somebody who is aware of the problem. If they are not aware of the problem because their speciality is obstetrics and gynecology, they won't be much help to him, so a vascular surgeon would be appropriate.
 The Court: How often should he be seen?
 The Witness: Oh, every three months.
 
 
 [4]
 In rejecting the claim that the Eleventh Amendment barred the Supreme Court from issuing a writ of error to the state to review a criminal conviction, Chief Justice Marshall, in Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 380-83, 5 L.Ed. 257 (1821), discussed the effect of the surrender of states' sovereignty on the power to sue them in federal court in suits arising out of the Constitution. Although we recognize the substantial difference between the issue there and that raised by appellant here, the language used is nonetheless of interest:
 The counsel for the defendant in error . . . . have laid down the general proposition that a sovereign independent state is not suable except by its own consent.
 This general proposition will not be controverted. But its consent is not requisite in each particular case. It may be given in a general law. And if a state has surrendered any portion of its sovereignty, the question whether a liability to suit be a part of this portion, depends on the instrument by which the surrender is made. . . . When we consider the situation of the government of the Union and of a state, in relation to each other; the nature of our Constitution; the subordination of the state governments to that constitution; the great purpose for which jurisdiction over all cases arising under the constitution and laws of the United States is confided to the judicial department, are we at liberty to insert in this general grant, an exception of those cases in which a state may be a party? Will the spirit of the constitution justify this attempt to control its words? We think it will not. We think a case arising under the constitution or laws of the United States, is cognizable in the courts of the Union, whoever may be the parties to that case.
 
 
 [5]
 Aside from the issue of state sovereign immunity, there is no question that suits for equitable relief may be brought pursuant to the Fourteenth Amendment. See, e. g. Griffin v. County School Board, 377 U.S. 218, 232-34, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955); Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); Gagliardi v. Flint, 564 F.2d 112, 125 (3d Cir. 1977) (Gibbons, J. concurring)
 
 
 [6]
 Although we do not base our decision on the manner in which the litigation was conducted by the prior representative of the state's Attorney General's office, we view with concern the consistent failure of the defendants to comply with the time requirements for answer and compliance with discovery requests. The trial judge found:
 The procedural history of this case demonstrates a pattern of conduct on the part of the defendants and their counsel amounting to willful and flagrant disregard of the rules of discovery and of specific Court Orders.
 He summarized the procedural history as follows:
 This action was begun on October 26, 1976 by the plaintiff pro se while an inmate at Trenton State Prison. The six individual defendants, the prison officials and employees, were served on October 28th, 1976 and answered on January 3rd, 1977. Plaintiff's first set of interrogatories were served on or about November 15th, 1976. The pattern of discovery was set early, as defendants failed to answer and had to be ordered to do so on April 12, 1977. Defendants ignored the April 12th Order and on May 24, 1977, the Court ordered the defendants to show cause why sanctions should not be imposed. Because of plaintiff's hospitalization, the return date on the hearing was adjourned from June 20th until September 7, 1977. In the interim, on or about July 5th, 1977, defendants provided answers to the plaintiff's first set of interrogatories. No sanctions were imposed at the September 7th hearing, but the Court ordered that the plaintiff be provided with his medical file. . . .
 On January 18th, 1978, William E. Staehle, Esquire, was appointed counsel for plaintiff. March, 1978, plaintiff was given leave to file an amendment to the complaint which added the State of New Jersey as a defendant. All defendants except New Jersey filed timely answers and plaintiff then resumed discovery.
 On June 28, 1978, all defendants were served with identical Requests for Admissions, supplemental interrogatories and a request for production of documents. No answers were forthcoming, nor was an extension of time to answer requested within the 30 day period of Fed.R.Civ.P. 33. Defendants eventually moved for an extension of time to answer, an extension of time for discovery and for leave to file an amended answer.
 On September 18th, 1978, the return date of defendant's motion, the Court signed an Order which, as amended, provided as follows: Defendants were permitted to file and serve an amended answer; defendants were given 20 days to answer plaintiff's supplemental interrogatories, request for production and request for admissions. Failure to comply with the above timetable would result in suppression of defendant's defenses. Discovery was extended for 20 days for all parties limited to interrogatories. Defendants were ordered to answer any new interrogatories propounded upon them within 15 days of service under penalty of suppression of defenses for failure to do so.
 On September 19th, 1978, defendants served interrogatories on plaintiff. October 4th, 1978, plaintiff served 17 identical second supplemental interrogatories on all defendants which addressed the separate defenses raised by the State in the amended answer and with the questions of insurance coverage and indemnification. Plaintiff timely answered defendants new interrogatories, but defendants failed to respond to any of the plaintiff's discovery within the time provided by the September 18th Order. As a result, their defenses were suppressed.
 We note the district court expressly exonerated present counsel, who entered the case for the defendants at the trial stage, from any responsibility for the state's misbehavior.
 
 
 [7]
 Although we have stated that the Eleventh Amendment has been interpreted as a jurisdictional bar, see Blake v. Kline, 612 F.2d 718 at 721 (3d Cir. 1979), we do not understand that to be an absolute bar to subject matter jurisdiction under 28 U.S.C. § 1331 under all circumstances when the state is a party. It is clearly established that the state's immunity can be waived by the state, see, e. g., Petty v. Tennessee-Missouri Bridge Comm'n., 359 U.S. 275, 276, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959); Gunter v. Atlantic Coast Line R. Co., 200 U.S. 273, 284, 26 S.Ct. 252, 50 L.Ed. 477 (1906), despite the principle that a waiver cannot confer jurisdiction on a court which lacks subject matter jurisdiction. C. Wright, Law of Federal Courts 17-18 (3d ed. 1976). Whatever the implication of the statement that the Eleventh Amendment is a jurisdictional bar, we know of no case which has used that reasoning to hold that the federal courts are devoid of the power to compel a state to comply with reasonable procedural requirements while it remains a party