Steven T. SEITZ, Plaintiff-Appellant,

v.

Robert C. CLARK et al.,
Defendants-Appellees.

No. 74–2633.

United States Court of Appeals,
Ninth Circuit.

Oct. 23, 1975.

Larry O. Gildea (argued), of Gildea & McGavic, Eugene, Or., for plaintiff-appellant.

Edward H. Warren (argued), of Hershiser, Mitchell & Warren, Portland, Or., for defendants-appellees.

## OPINION

Before CHAMBERS and KILKENNY, Circuit Judges, and JAMESON,* District Judge.

JAMESON, District Judge:

Plaintiff appellant, Steven T. Seitz, was employed as a visiting assistant professor at the University of Oregon for the 1972–1973 academic year. When his employment contract was not renewed, he brought this action under the Civil Rights Act of 1971, 42 U.S.C. § 1983, against defendants-appellees, who are officials of the University, including the president, members of the State Board of Higher Education, and members of the faculty of the Political Science Department. Plaintiff sought damages and injunctive relief, contending that he had "a reasonable, bilateral expectancy of continued employment", was denied his constitutional right of due process in the termination of his contract without a hearing, and did not receive proper notice of termination. Both sides moved for summary judgment based on stipulated facts.[1] In granting defendants' motion and denying that of plaintiff, the district court found that "neither the terms of plaintiff's contract, the administrative rules and regulations of the University, nor the practices of the Political Science Department created a reasonable expectancy of continued employment"; that "plaintiff did not have a sufficient property interest" to require a hearing; and that he "received timely and proper notice of his termination".

### FACTUAL BACKGROUND

Seitz was hired as a "visiting assistant professor" in the Department of Political Science for the period September 16, 1972 to June 15, 1973. By letter from the chairman of the Department dated March 12, 1973, Seitz was notified that his position "would terminate as of June 15, 1973, the date agreed upon". In contending that "he had sufficient property interest that required pre-termination due process considerations" of a more complete nature than those accorded him, appellant relies in part on his contract, conditions of employment, and an exchange of letters between appellant and Harry Alpert, Vice President for Academic Affairs and Provost, and in part on letters he received from members of the faculty prior to acceptance of his appointment.

### Contract and Conditions of Employment

On July 3, 1972 Alpert wrote Seitz offering him a "one-year appointment as Visiting Assistant Professor of Political Science beginning September 16, 1972, and ending June 15, 1972, at a salary of $11,500". The letter continued:

"By designating this as a 'visiting' position, we are indicating that it is an appointment only for one academic year. We have no expectation that this position will be extended. Therefore, you should not accept with thought of retaining the position beyond one academic year.

"I regret having to stress the temporary nature of the offer, but my desire to avoid any possible misunderstanding requires me to state the condition in this manner."

After communicating with members of the faculty Seitz wrote Alpert on July 26, acknowledging receipt of the July 3 letter and stating:

"I am writing to accept that offer, noting that:

1. The original salary to which I agreed verbally was $12,000 rather than $11,500.

2. I come to Oregon with the expectation that all efforts will be made, in good faith, to secure further funding for my appointment beyond academic year 1972–1973."

* Honorable W. J. Jameson, United States Senior District Judge for the District of Montana, sitting by designation.

1. The stipulation listed numerous exhibits and depositions for consideration "to the extent that the court determines they constitute admissible evidence".

To this letter Alpert replied on July 31:

"Thank you for your letter of July 26, 1972 in which you advise me of your acceptance of my offer of July 3, 1972. We look forward to your joining our faculty this September as a Visiting Assistant Professor and trust that the unfortunate misunderstandings relating to your appointment will have been dissolved.

"I must insist, however, that, despite point number 2 of the matters you note in your communication of July 26, your acceptance of our official notice of appointment and your receipt of salary payments from the University of Oregon and the Oregon State Board of Higher Education can only be interpreted as meaning that you are accepting the conditions and understandings set forth in my July 3 offer.

"Your continuation at the University of Oregon beyond June 15, 1973 will have to be considered later in the academic year on the basis of the staffing requirements of the Department of Political Science, the availability of funds, and your performance as a faculty member. The University of Oregon cannot obligate itself to make a good faith effort to secure further funding for your appointment beyond 1972–73 without appropriate consideration of these factors."

The Notice of Appointment dated September 15, 1972 recited that the State Board of Higher Education had approved the appointment for the "academic year beginning September 16 and ending June 15" for the position of "Visiting Assistant Professor of Political Science", at a salary of $11,500. The "Conditions of Appointment" recited that the "Tenure Status" was "Annual" and the "Term of Service" was "9-month", and contained the following: *"Note: This is a one-year appointment for the academic year 1972–73."* (Emphasis in Original) An attached "Letter of Understanding", signed by Seitz reads:

"The stipulated salary on this contract at $11,500 represents a change from the original verbal agreement at $12,-000."

*Letters from Members of Faculty*

Following receipt of Alpert's letter of July 3, 1972, Seitz wrote to three members of the faculty—Dean Moyer of the College of Liberal Arts, Professor Klonoski, Chairman of the Political Science Department, and Professor Medler of that department.

In the letter to Dean Moyer, appellant stated that he fully understood "the legal intent of the letter from Alpert", but needed to know from Moyer the "mood" of the administration regarding the expectation that his appointment would be extended at least an additional year. In reply Moyer wrote in pertinent part:

"My answer to you must then be at present we cannot make any commitment for 1973–1974, but our present view is that we would like to do so. In view of the recent retirements and resignations, it is not inconceivable that we might accomplish it, but it is by no means assured."

Professor Klonoski wrote Seitz on July 2, July 11 and July 31. His letters related in large part to the reduction in salary from $12,000 to $11,500, were critical of Alpert and the University administration, and indicated that the Department in the past had been able to keep the people it really wanted. In his letter of July 11 Klonoski stated that he could not "really disagree" with what Dean Moyer said regarding the "mood" of the Administration and continued in part:

"There is no way, as I explained to you, that I can guarantee anything for sure. But I feel pretty good in your case, regardless of all the uncertainties. I agree—Klonoski feels pretty good—is hardly the kind of assurance you need. The Department will make every effort—to keep you on beyond 72–73 if you want to remain. . . .

"I can't say much more—the experience of the past 4 or 5 weeks has numbed me to the point where I'm walking around wondering how/why I

ever decided there was anything in a Departmental Chairmanship." [2]

*Notice of Termination*

At a faculty meeting on February 11, 1973 the Political Science Department directed its personnel committee to inform the Dean that the Department wanted to rehire Seitz for the following academic year. Apparently the committee did not do so. At a meeting on February 14 the faculty voted to request Seitz to seek an extension of time within which to answer an offer he had received from another institution.

"During March of 1973, it became apparent that the University would only have adequate funds to extend offers for the next academic year to three of the four visiting assistant professors" in the Department. "On March 9, 1974, the Political Science Department voted to recommend that plaintiff not be offered a position for the next academic year". (From Stipulated Facts) The letter to Seitz from James R. Klonoski, Department Chairman, dated March 12, 1973, stated:

"As you know, the notice of appointment you received as a visiting assistant professor of Political Science and the understanding by which you were hired limited your employment to the period September 16, 1972 to June 15, 1973. I regret that I must inform you that your position will terminate as of June 15, 1973, the date agreed upon. . . . If funds should become available, we shall reassess our position as rapidly as possible. However, you should make your plans on the basis that your appointment will expire according to its terms."

## RIGHT TO PRETERMINATION HEARING

■ It is clear from two related decisions of the Supreme Court, *Board of*

*Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) and *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), that a nontenured teacher does not have a constitutional right to a pretermination hearing, unless he can show that the nonrenewal deprived him of an interest in "liberty" or that he had a "property" interest in his continued employment. Appellant claims that he had a property right in his teaching appointment which entitled him to a hearing under the *Roth-Sindermann* rule. We disagree.

*Roth* involved facts similar in many respects to those in this case. Roth was hired as assistant professor at Wisconsin State University—Oshkosh for a fixed term of one academic year. He was informed without explanation that he would not be rehired for the ensuing year. In holding that Roth did not have a property interest sufficient to require a hearing the Court said in part:

"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

"Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law— rules or understandings that secure certain benefits and that support

2. Professor Medler, in commenting on Alpert's letter to appellant, said in part that Alpert was "in a bind", money was "very tight", and the Administration was "not at all creative about using it or obtaining more so they think constantly in terms of cuts". He saw Alpert's

"letter as a legal ploy. If they feel they have to fire next year they will have prepared an adequate pool of people who are given adequate notice in a legal sense and in the semi-legal culture of the AAUP."

claims of entitlement to those benefits. . . ."

[The contract] "terms secured his interest in employment up to June 30, 1969. But the important fact in this case is that they specifically provided that the respondent's employment was to terminate on June 30. They did not provide for contract renewal absent 'sufficient cause.' Indeed, they made no provision for renewal whatsoever.

"Thus, the terms of the respondent's appointment secured absolutely no interest in re-employment for the next year. They supported absolutely no possible claim of entitlement to re-employment. Nor, significantly, was there any state statute or University rule or policy that secured his interest in re-employment or that created any legitimate claim to it. In these circumstances, the respondent surely had an abstract concern in being rehired, but he did not have a *property* interest sufficient to require the University authorities to give him a hearing when they declined to renew his contract of employment." [Emphasis in original.] 408 U.S. at 577–578, 92 S.Ct. at 2709.

*Perry v. Sindermann* involved a college professor who had been employed for ten years in the Texas Public Higher Education System through a series of one year contracts. During his tenth year he was notified that his contract would not be renewed. In contending that he was entitled to a hearing, Sindermann alleged that, while the college had no formal tenure system, it had a "defacto tenure program" on which faculty members relied. In remanding for a hearing, the Court held that while "a mere subjective 'expectancy' is" not "protected by procedural due process", if Sindermann could prove his allegations

that there was a defacto tenure system and that he "had no less a 'property' interest in continued employment than a formally tenured teacher at other colleges", then "such proof would obligate college officials to grant a hearing at his request, where he could be informed of the grounds for his nonretention and challenge their sufficiency". 408 U.S. at 600–603, 92 S.Ct. at 2699.

In *Papadopoulos v. Oregon State Board of Higher Ed.*, 14 Or.App. 130, 511 P.2d 854 (1973), the Oregon Court of Appeals analyzed in detail the applicable statutes of Oregon and the Administrative Rules of the State Board of Higher Education in determining whether a university teacher had a "constitutional right, under the Due Process Clause, to a pre-discharge hearing." [3] Papadopoulos was a professor at Oregon State University who had received three annual contracts. During the third year the University decided to deny Papadopoulos tenure and to terminate his employment. Following *Roth* and *Sindermann*, the court concluded that Papadopoulos as a nontenured professor, even though he had received several successive annual contracts, did not thereby acquire a property interest in continued employment that required a pretermination hearing. Accordingly the court held that "petitioner could have been discharged at the end of any of those years for any reason or no reason, and he would have no right to a hearing on the grounds for his discharge".[4] 511 P.2d at 872.

*Papadopoulos* was followed in *Perrin v. Oregon State Board of Higher Education*, 15 Or.App. 268, 515 P.2d 409 (1973). Perrin was an assistant professor at the University of Oregon from 1964 through 1972, with the exception of one year's

---

**3.** In *Papadopoulos* the court noted that a public employee in Oregon, including a university teacher, is generally in one of three groups: (1) those with permanent job security, i. e., tenured; (2) those with no job security, i. e., probationary; and (3) those with some but not permanent job security. The court concluded that tenured public employees have due proc-

ess rights to a hearing, but probationary employees do not.

**4.** The court held further that annual appointments created "property interests in the sense that petitioner could not have been discharged during any of those academic years without the Board's first holding a hearing on the reasons for the discharge".

absence at another institution. He had annual rather than indefinite tenure. His employment was terminated by notice without a hearing. Relying in large part on the status of employment specified in the Notice of Appointment, the court held that Perrin "cannot be said to have had anything more than a hope that he would receive tenure. That hope is not a property right and the frustration of such a hope does not trigger the right to a hearing" citing *Roth* and *Papadopoulos.* 515 P.2d at 411.

In contending that communications with University officials and faculty members created a "bilateral expectation of continued employment" appellant relies on *Perry v. Sindermann, supra.* The course of dealings between Seitz and the University does not, however, rise to the level of bilateral expectation that the Supreme Court held in *Sindermann* must be established to create a property interest requiring a hearing. In *Sindermann* there was a history of nine renewals of annual contracts and alleged evidence of an unofficial tenure system. There is nothing in the regulations of the University of Oregon, the contract, or the conditions of employment to manifest any similar tenure program or any bilateral expectation of continued employment. In fact, the Administrative Manual of the University of Oregon states that the status of "visiting" rank may be "used for appointment of staff members who, in every respect, are qualified for regular faculty appointments at the University, but whose employment at the University is intended to be limited to one or two years or to one or two terms".[5] While some of the unofficial letters from faculty members might justify a "hope" or "subjective expectancy" that Seitz would be rehired, all were ambiguous

and expressly qualified in warning Seitz that no promises were or could be made. The Notice of Appointment and official communications from University officials all stated expressly that Seitz's contract would terminate on June 15, 1973.

■ Appellant argues further that the nonrenewal of his contract amounted to a termination for cause (thus entitling him to a hearing), since there is an implication of professional incompetency in such a dismissal. The Supreme Court in *Roth,* 408 U.S. at 573–575, 92 S.Ct. at 2708 rejected a similar contention, noting that there was no charge that might seriously damage Roth's standing, associations or future employment prospects, and all "that clearly appears is that the respondent was not rehired for one year at one university". The same is true here. The letter of termination to Seitz made it clear that the nonrenewal of his contract was due to lack of funds rather than dissatisfaction with his performance. It stated that, "If funds should become available, we shall reassess our position as rapidly as possible."

■ As in *Roth,* the Notice of Appointment provided that appellant's employment would terminate on a specified date, and the term of his employment "secured absolutely no possible claim of entitlement to re-employment". Appellant did not acquire a "*property* interest sufficient to require the University authorities to give him a hearing when they declined to renew his contract of employment".

### SUFFICIENCY OF TERMINATION NOTICE

Relying on the Rules of the Board of Higher Education, as construed in *Papadopoulos* and *Perrin, supra,* appellant

---

5. In Alpert's initial letter to Seitz of July 3, 1972 he explained that a "visiting" position was "an appointment for only one academic year" and that Seitz should "not accept with thought of retaining this position beyond one academic year". In his letter of July 31, 1972 Alpert stated that Seitz' acceptance could only be interpreted as meaning that Seitz "was accepting the conditions and understandings" set

forth in the July 3 letter. The further statement that Seitz' continuation beyond June 15, 1973 would "have to be considered later in the academic year", based on the factors therein enumerated, does not constitute a modification of the one year contract, particularly in view of the provisions of the Notice of Appointment and Conditions of Appointment.

contends that his constitutional right to due process was denied because he did not receive timely and proper notice of nonrenewal of his contract. The Rules contain the following provisions:

"41.020 *Terms of Service of Staff and Faculty*

1. Staff members may be appointed on the academic-year basis, the fiscal-year basis, or on such other basis as may be arranged in individual cases.

"41.310 *Timely Notice*

If any appointment of an academic staff member on .81 FTE or more, not an indefinite tenure, is to be terminated otherwise than for cause, he shall be given timely notice of termination in writing as follows: During the first annual appointment, at least three months' notice; thereafter, at least twelve months' notice before the expiration of an appointment."

In *Papadopoulos* the court held that the effect of this "Timely Notice" rule was "to entitle the Board's academic employes to continued employment unless and until they receive timely notice of the termination in accordance with the [agreement]". Papadopoulos was employed on annual contracts from September, 1967 to June, 1970. On February 25, 1969 the Dean of the School of Science sent Papadopoulos a notice that his employment would be terminated in June 1970. A further notice was sent by the President of the University on September 24, 1969, less than 12 months prior to the termination date. The court concluded "that there is no authority to terminate a professor's employment below the University President level", the notice from the President was "tardy", and Papadopoulos' employment could not be terminated without a hearing prior to the expiration of the following academic year. The court, however, said further: "Presumably, there would be no problem with the Board's delegating some or all of its authority over personnel decisions to subordinates. . . . However, the Board's regulations are obscure as to whether there has, in fact, been such a delegation." 511 P.2d at 874.

In *Perrin,* the Dean of Faculties sent Perrin a letter dated April 30, 1971 stating "that the president of the University would not approve his promotion to the rank of associate professor with indefinite tenure". A letter dated June 10, 1973 from the head of Perrin's department stated that the April 30 letter "should be regarded as a terminal notice for the academic year 1971–72". 515 P.2d at 410. Perrin had been employed on annual contracts since 1964. The court concluded that there was no problem, "as there was in *Papadopoulos,* of construing the recommendation of a subordinate as a definitive decision by one entitled to make the decision. The termination process was carried out under the direction of the president of the university, and mechanical functions were delegated." The court held further that the April 30 letter "saying that the president did not approve tenure, and the letter from the department head saying that the April 30 letter should be regarded as a terminal notice are sufficient to put petitioner on notice that his contract would not be renewed". *Id.* at 412.

The factual situation here differs materially from that of *Papadopoulos* and is more favorable to the position of appellees than that considered in *Perrin.* Papadopoulos was a nontenured professor and Perrin a nontenured assistant professor. Each had been employed for several years on annual contracts. Seitz was employed as a "visiting assistant professor", and the temporary nature of his appointment had been set forth in numerous communications including the notice of appointment. He signed the Conditions of Employment form which contained the following: *"Note: This is a one-year appointment for the academic year 1972–73".* It is conceded that he received the notice of termination signed by the head of his department more than 90 days prior to his termination.

■ Appellant contends, however, that under *Papadopoulos* he was entitled to the "90-day notice from the president of the University of Oregon, defendant Robert Clark" and that the department chairman was not authorized to give the

notice. We do not agree. Attached to defendants' motion for summary judgment is an affidavit of President Clark that he "delegated to Harry Alpert, Vice-President of Academic Affairs and Provost, the authority to establish conditions of employment for academic personnel at the University of Oregon for the academic years material herein".[6] An affidavit of Alpert recites that one of his duties consisted of exercising the authority of the President of the University of Oregon on academic personnel matters and at the beginning of the academic year 1972–1973, he "authorized Professor Klonoski to issue the courtesy notice contained in the letter of March 12, 1973, on behalf of the President of the University of Oregon".[7] The affidavit continues:

"An appointment as Assistant Professor includes the understanding that the appointee is a probationary employee who will be considered for promotion and indefinite tenure at a future time. Such an appointee is entitled to 90 days notice of non-renewal during the first academic year and 12 months notice of non-renewal thereafter.

"An appointment as a *Visiting Assistant Professor* carries no such understanding and terminates pursuant to its own terms at the end of the academic year. A Visiting Assistant Professor is entitled to no notice of termination beyond the terms of his appointment." [8]

Appellees contend that the terms and conditions of appellant's appointment as a visiting assistant professor *per se* provided him with notice at the time of hiring that his position would terminate automatically at the end of the academic year. As set forth in Alpert's affidavit, it is the position of the University that the notice sent by Alpert was merely a courtesy notice.

■ It is unnecessary to decide whether any notice was required. We conclude that under the circumstances the notice given the appellant was sufficient. It is clear that appellant accepted the position with the understanding that as a "visiting" assistant professor his contract would terminate on June 15, 1973, and that any renewal would be subject to further consideration if funds were available. As in *Perrin,* this notice of the temporary nature of his appointment and the notice give by the department chairman were sufficient to put appellant "on notice that his contract would not be renewed".

Affirmed.

---

6. The Notice of Appointment was signed by Alpert on behalf of the University and all official letters to Seitz regarding the terms of employment were written by Alpert.

7. This is confirmed by the deposition of Professor Klonoski, taken as an adverse party, by appellant. He testified that he received forms from Alpert to be sent to visiting assistant professors. He was to keep the forms available for use before March 15 and then send out "whatever letter best fits the situation".

8. In Klonoski's deposition he testified on direct examination by appellant's counsel:
"Q. Can you summarize the substance of those conversations (with Seitz) about the term of employment that he would have been offered?
"A. A visiting assistant professorship is for one year. No agreement, no under-

standing or renewability. No expectation of renewability unless the financial picture at the university was such that we were in a position to make him an offer.
"Q. Did you indicate to him that if the financial position was such that he would be offered another—
"A. We'd make every effort if he proved out in that year he was with us."
Klonoski testified further:
"Q. Can you define for me what is meant by a visiting assistant, or what does the term 'visiting' mean?
"A. The university saying in the best way it can the employee is the most temporary kind of person possible. That he is here for a year and he has no guarantee or expectation that he is to be rehired. There's no better way to communicate to the man the temporary nature of his appointment."