**Mark HARRIS and Josephine Harris, husband and wife, Plaintiffs,**

v.

**ARIZONA BOARD OF REGENTS, a body corporate; Paige E. Mulhollan and Jane Doe Mulhollan, husband and wife; Guido G. Weigend and Jane Doe Weigend, husband and wife; Marvin Fisher and Jane Doe Fisher, husband and wife, Defendants.**

No. CIV 81–635 PHX VAC.

United States District Court,
D. Arizona.

Dec. 23, 1981.

Rodney G. Johnson, McGowan & Johnson, Phoenix, Ariz., Nadia B. Axford, Tempe, Ariz., for plaintiffs.

Charles W. Wirken, Killian, Legg, Nicholas & Fischer, Mesa, Ariz., for defendants.

## OPINION AND ORDER

CORDOVA, District Judge.

This matter is before the Court on plaintiff's[1] application for preliminary injunction and on a motion to dismiss filed by the defendant Arizona Board of Regents (Board). For the reasons below the motion to dismiss will be granted and a preliminary injunction will issue against the remaining defendants.

## FACTS

Plaintiff Mark Harris is an accomplished writer whose works include the screenplay *Bang the Drum Slowly*. He was a tenured professor at the University of Pittsburgh in the spring of 1980 when he entered into a series of written and oral negotiations with the defendant university officials about the possibility of joining the faculty at Arizona State University (A.S.U.). As outlined in greater detail below, plaintiff accepted an offer for a position as Professor of English and Director of the Creative Writing Program. This offer contained a unique provision that plaintiff would receive tenure "automatically" in his third year of employment or sooner by mutual convenience. He assumed the position in August of 1980.

The Department of English Personnel Committee reviewed plaintiff's performance and recommended retention by a five to one vote on February 10, 1981. (Exhibit 46). Upon being informed of this evaluation, and after he was advised of certain criticisms of his performance, (Exhibit 35), plaintiff objected that he was not to be reviewed for tenure. At about this time plaintiff also complained of his lack of influence in the selection of a person to fill an assistant professor position in the Creative Writing Program. (Exhibit 14). Specifically, plaintiff opposed the candidacy of Rita Dove, a black female, on the asserted grounds that she was from outside the Program and was no better qualified than the inside candidates plaintiff preferred. Plaintiff even went so far as to threaten to contact Ms. Dove to inform her that she would not be welcome in his program.

After these incidents the Personnel Committee met again on March 5, 1981 and unanimously agreed to reverse its prior recommendation. (Exhibit 27). In its report of March 9, 1981 the Committee recommended that plaintiff be offered a terminal contract for the year 1981–1982. (Exhibit 47). This recommendation was accepted by defendant Provost Paige E. Mulhollan who notified plaintiff of the decision in a letter dated March 12, 1981. (Exhibit 36). Plaintiff then presented his dispute to two faculty advisory groups, the Academic Freedom and Tenure Committee and the American Association of University Professors. While the record does not reveal what actions were taken by the latter group, the former committee conducted a hearing and concluded that plaintiff was entitled to a regular and not a terminal contract. (Ex-

---

[1]. While both Mark Harris and his wife Josephine are plaintiffs in this case, the only claims presently before the Court relate to Mark Harris and thus he is referred to herein as plaintiff.

hibit 29). The Provost rejected this conclusion and reaffirmed his intention to offer plaintiff a terminal contract for the 1981–1982 academic year. (Exhibit 33).

Plaintiff was officially offered a terminal contract by means of a Notice of Appointment dated June 1, 1981. (Exhibit 9). The Notice granted plaintiff ten days in which to accept the appointment, in which event 1981–1982 would be his last year of employment. Failure to accept the offer within ten days would constitute a rejection of the appointment. On June 3, 1981 plaintiff's attorneys wrote a letter to A.S.U. President J. Russell Nelson requesting the opportunity to discuss plaintiff's contract dispute. (Exhibit 10). This request was denied on June 5, 1981 by the Provost, who responded on behalf of President Nelson. (Exhibit 12).

On June 9, 1981 plaintiff filed the present action seeking equitable and declaratory relief, as well as damages. The complaint alleges many theories including breach of contract, intentional interference with an advantageous contractual relationship, intentional and/or negligent infliction of emotional distress, and deprivation of civil rights in violation of 42 U.S.C. §§ 1983 and 1985. Following oral argument on June 11, 1981 this Court issued a temporary restraining order to preserve the status quo and plaintiff remains in his position with the university. A hearing on plaintiff's application for preliminary injunction was held on July 16, 1981. Since no evidence was presented on several of the claims raised in the complaint, the Court will decline the request to consolidate that hearing with the final trial under Rule 65(a)(2) of the Federal Rules of Civil Procedure.

## MOTION TO DISMISS

The Board has filed a motion to dismiss on the grounds that the Court lacks juris-diction and that plaintiff's complaint fails to state a claim against the Board upon which relief can be granted. Initially, the Court will consider whether a cause of action exists under § 1983 or under the Constitution, and determine whether jurisdiction exists under 28 U.S.C. § 1331 as alleged in the complaint. The Court will also consider whether the Board is entitled to raise an Eleventh Amendment sovereign immunity defense.

*Section 1983 Cause of Action*

The Board contends that it is a state agency, *City of Tempe v. Arizona Bd. of Regents*, 11 Ariz.App. 24, 25, 461 P.2d 503 (1969), and as such is not a "person" within the meaning of § 1983.[2] *Whitner v. Davis*, 410 F.2d 24 (9th Cir. 1969); *Bennett v. California*, 406 F.2d 36 (9th Cir.), *cert. denied*, 394 U.S. 966, 89 S.Ct. 1320, 22 L.Ed.2d 568 (1969); *see Sellers v. Regents of Univ. of Cal.*, 432 F.2d 493 (9th Cir.), *cert. denied*, 401 U.S. 981, 91 S.Ct. 1194, 28 L.Ed.2d 333 (1970). Plaintiff attempts to distinguish the cases relied upon by the Board and asserts that the Board is a § 1983 "person."

A recent body of case law leads the Court to conclude that the Board is a "person" within the terms of § 1983. In 1978 the Supreme Court greatly expanded the concept of "person" when it held that "there is no justification for excluding municipalities from the 'persons' covered by [§ 1983]." *Monell v. Department of Social Services*, 436 U.S. 658, 701, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). *Monell* overturned the Court's prior decisions that local governmental units were not "persons," *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); *City of Kenosha v. Bruno*, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973), and substantially undermined the vitality of the Ninth Circuit cases cited by the

---

**2.** Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

Board. *See Silverton v. Department of Treasury,* 644 F.2d 1341, 1344–45 n.3 (9th Cir. 1981). The language of § 1983 is broad and sweeping. *Owen v. City of Independence,* 445 U.S. 622, 635–36, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980); *Sellars v. Procunier,* 641 F.2d 1295, 1298 (9th Cir. 1981). Since there would appear to be no analytical difference in the operation of the Board and the governing bodies found to be "persons" in *Monell,* the Court determines that the Board is a "person" for § 1983 purposes. *See Gay Student Services v. Texas A & M Univ.,* 612 F.2d 160, 163–64 (5th Cir.), *cert. denied,* 449 U.S. 1034, 101 S.Ct. 608, 66 L.Ed.2d 495 (1980) (university held to be "person"); *Tayyari v. New Mexico State Univ.,* 495 F.Supp. 1365, 1370 (D.N.M. 1980).

The Court is aware that the Supreme Court opinion in *Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 39 L.Ed.2d 358 (1979) has been interpreted as holding that States and state agencies are not § 1983 "persons." *See e.g., Quern v. Jordan, supra,* 440 U.S. at 350, 99 S.Ct. at 1150 (Brennan, J., concurring); *O'Connor v. State of Nevada,* 507 F.Supp. 546, 551 (D.Nev.1981); Schnapper, *Civil Rights Litigation After* Monell, 79 CO-LUM.L.REV. 213, 254 (1979). This Court is not persuaded that such an interpretation is supported by the language of the opinion. In deciding that § 1983 was not intended to abrogate the Eleventh Amendment sovereign immunity of the States, the *Quern* Court specifically stated that its decision did not "render § 1983 meaningless insofar as States are concerned. See *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)." 440 U.S. at 345, 99 S.Ct. at 1147. In light of this passage this Court is unable to agree that States do not meet the threshold "person" requirement of § 1983,

since such a construction would indeed render § 1983 "meaningless" as to them. Rather, the plain inference to be drawn from the Court's statement and reference to *Ex parte Young* is that States and state agencies are not removed from the class of § 1983 "persons" simply because they may be able to raise an Eleventh Amendment defense. *See Gay Student Services v. Texas A & M University, supra,* 612 F.2d at 163–64 n.3.[3] The assessment of an entity's status under § 1983 is analytically distinct from the inquiry into the entity's status under the Eleventh Amendment. *See id.* at 163–65.

■■■ Since the Board is a § 1983 "person," and since the issuance of the terminal contract represents a matter of official action by the Board, *Monell v. Department of Social Services, supra,* 436 U.S. at 694, 98 S.Ct. at 2037, it is clear that the complaint states a cause of action under § 1983 against the Board. While § 1983 creates a cause of action, it does not confer jurisdiction upon the Court. A potential jurisdictional problem arises from the fact that the complaint alleges jurisdiction under § 1331, and does not cite 28 U.S.C. § 1343(3), the traditional jurisdictional counterpart to § 1983. Plaintiff's failure to cite § 1343(3) is of no consequence since the complaint plainly indicates an intention to invoke the Civil Rights Act. *Whitner v. Davis, supra,* 410 F.2d at 28 n.3. Moreover, now that the jurisdictional amount requirement of § 1331 has been abolished,[4] arguably § 1331 may provide a jurisdictional base for § 1983 causes of action. *See Fair Assessment in Real Estate Ass'n, Inc. v. McNary,* —— U.S. ——, ——, 102 S.Ct. 177, 191, 70 L.Ed.2d 271 (1981) (Brennan, J., concurring).

---

**3.** In *Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978) (per curiam), the Court held that the State of Alabama and the Alabama Board of Corrections could not be enjoined in a § 1983 action because they had not waived their Eleventh Amendment sovereign immunity defense. The significance of the case for present purposes is that the Court did not even consider the "person" issue, and implied that the State and its agency could be

sued under § 1983 if an Eleventh Amendment waiver had been shown. *See McConnell v. Critchlow,* 661 F.2d 116, 117 (9th Cir. 1981).

**4.** The jurisdictional amount was deleted by amendment effective December 1, 1980. Section 1331 now provides: "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

*Implied Cause of Action Under the Constitution*

■ Plaintiff next contends that the Court also has § 1331 jurisdiction over the Board as a result of a cause of action implied from the Constitution. Plaintiff alleges that he was terminated for exercising his First Amendment right of speech and that the manner in which his contract was terminated resulted in a deprivation of his due process rights under the Fourteenth Amendment. Since these claims cannot be said to be "wholly insubstantial and frivolous," federal question jurisdiction exists under § 1331. *Bell v. Hood*, 327 U.S. 678, 682–83, 66 S.Ct. 773, 90 L.Ed. 939 (1946); *see City of Kenosha v. Bruno, supra*, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109; *Molina v. Richardson*, 578 F.2d 846, 848–49 (9th Cir.), *cert. denied*, 439 U.S. 1048, 99 S.Ct. 724, 58 L.Ed.2d 707 (1978).

Even though the alleged constitutional violations provide another avenue of § 1331 jurisdiction over the Board, it is a separate matter whether the complaint states a constitutionally based claim upon which relief may be granted. As the Ninth Circuit has stated, "the existence of a cause of action is conceptually distinct from the presence of jurisdiction." *Id.* at 849. Thus, the Court will consider whether a *Bivens*-type cause of action may be implied under the present circumstances.[5]

■ Although the Supreme Court did not decide whether a *Bivens*-type action may be implied in a case involving the First and Fourteenth Amendment rights of a terminated school teacher, *Mt. Healthy City School Dist. v. Doyle*, 429 U.S. 274, 278–79, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the Court has recently exhibited a willingness to recognize such actions in other circumstances. *Carlson v. Green*, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980) (prisoner's Eighth Amendment rights); *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) (congressional assistant's Fifth

Amendment due process rights). Several lower courts have inferred causes of action for damages directly from the First Amendment. *See, e.g., Gillespie v. Civiletti*, 629 F.2d 637, 641–42 (9th Cir. 1980) (First, Fifth and Eighth Amendments); *Dellums v. Powell*, 566 F.2d 167, 194–95 (D.C.Cir.1977), *cert. denied*, 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978); *Paton v. La Prade*, 524 F.2d 862, 869–70 (3d Cir. 1975). In the case at bar, however, it is unnecessary to determine whether a direct right of action for damages should be recognized as the present state of the record does not permit disposition of plaintiff's claim for damages. *See Jensen v. Farrell Lines, Inc.*, 625 F.2d 379, 384 n.3 (2d Cir. 1980). Moreover, even though the Court may otherwise be inclined to infer a *Bivens*-type cause of action regarding plaintiff's claim for injunctive and declaratory relief, this is unnecessary since a cause of action exists against the Board under § 1983. In *Ward v. Caulk*, 650 F.2d 1144, 1148 (9th Cir. 1981), the Ninth Circuit held that "there is no basis for permitting a constitutionally based suit against state defendants where the plaintiff has a statutory remedy under § 1983." *See Molina v. Richardson, supra*, 578 F.2d at 853; *see also Carlson v. Green*, supra, 446 U.S. at 18–20, 100 S.Ct. at 1471–1473.

*Eleventh Amendment Sovereign Immunity*

■ Although the Board has only indirectly argued that it is entitled to a sovereign immunity defense, "the Eleventh Amendment defense sufficiently partakes of the nature of a jurisdictional bar" so that the Court will consider its application in this case. *Edelman v. Jordan*, 415 U.S. 651, 678, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *see Mills Music, Inc. v. Arizona*, 591 F.2d 1278, 1282 (9th Cir. 1979); *N.A.A.C.P. v. California*, 511 F.Supp. 1244, 1249 (E.D.Cal. 1981). The Eleventh Amendment by its express terms covers suits against a State by citizens of another State or country.[6]

---

**5.** In *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the Court implied a cause of action and a damages reme-

dy under the Fourth Amendment against federal defendants.

**6.** The Eleventh Amendment provides: "The Ju-

But the courts have extended its immunities to States when sued by its own citizens, *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), and to arms and instrumentalities of States as well. *Ford Motor Co. v. Department of Treasury,* 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945). Whether an entity is an arm or instrumentality of the State partaking of the State's Eleventh Amendment immunity turns on its function and characteristics as determined by state law. *Mt. Healthy City School Dist. v. Doyle, supra,* 429 U.S. at 280, 97 S.Ct. at 572; *Sessions v. Rusk State Hosp.,* 648 F.2d 1066, 1069 (5th Cir. 1981).

■ In determining whether the Board is an arm or instrumentality of the State the Court has considered the state statutory scheme, case law and relevant testimony at the hearing. The Arizona legislature has granted the Board extensive administrative powers to govern the State's three universities, Ariz.Rev.Stat. §§ 15–721 to 730, and in exercising these powers the Board is performing an essential governmental function. *See Hutchison v. Lake Oswego School Dist. No. 7,* 519 F.2d 961, 966–67 (9th Cir. 1975). Board members are appointed by the Governor and approved by the Senate, Ariz.Rev.Stat. §§ 15–721, 38–211, and the Board is required to submit a detailed report to the Governor after the close of each fiscal year. Ariz.Rev.Stat. § 15–727. Thus the State retains a measure of control over the Board. *See Vaughn v. Regents of Univ. of Cal.,* 504 F.Supp. 1349, 1353 (E.D. Cal.1981); *An-Ti Chai v. Michigan Technological Univ.,* 493 F.Supp. 1137, 1163 (W.D. Mich.1980). Although the Board is independent to the extent it is a body corporate and may sue and be sued, Ariz.Rev.Stat. § 15–724, *see Hutchison v. Lake Oswego School Dist. No. 7, supra,* 519 F.2d at 966–67, it has been found to be a state agency for city tax law purposes. *City of Tempe v. Arizona Bd. of Regents, supra,* 11 Ariz.App. at 25, 461 P.2d 503. More importantly, the Arizona Supreme Court has held that if a judg-

ment of money damages is secured against the Board, "the state will have been successfully sued .: .." *Arizona Bd. of Regents v. Arizona York Refrigeration Co.,* 115 Ariz. 338, 565 P.2d 518, 520 (1977). In addition, it appears that the Board is as much an "alter ego" of the State as is the Arizona Coliseum and Exposition Center Board, Ariz.Rev.Stat. 3–1001 to 1012, a "political entity" which has been allowed to raise an Eleventh Amendment defense. *Mills Music, Inc. v. Arizona, supra,* 591 F.2d at 1282. These considerations lead the Court to conclude that the Board is an arm or instrumentality of the State under the Eleventh Amendment. *Rutledge v. Arizona Bd. of Regents,* 660 F.2d 1345, 1349–50 (9th Cir. 1981); *Ronwin v. Shapiro,* 657 F.2d 1071, 1073 (9th Cir. 1981); accord, e.g., *Vaughn v. Regents of Univ. of Cal., supra,* 504 F.Supp. at 1352–54; *An-Ti Chai v. Michigan Technological Univ., supra,* 493 F.Supp. at 1162–64; *Henry v. Texas Tech Univ.,* 466 F.Supp. 141, 146 (N.D.Tex.1979).

■ As an arm 'or instrumentality of the State the Board is immune from suit under the Eleventh Amendment unless it has waived its immunity, and such a waiver is not to be lightly inferred. *Ronwin v. Shapiro, supra,* 657 F.2d at 1073; *Jacobson v. Tahoe Regional Planning Agency,* 566 F.2d 1353, 1361 (9th Cir. 1977), *rev'd in part and aff'd in part on other grounds sub nom. Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979). Although in *Stone v. Arizona Highway Comm'n,* 93 Ariz. 384, 381 P.2d 107 (1963), the Arizona Supreme Court abolished sovereign immunity from tort claims, consent to be sued in state court does not necessarily imply consent to be sued in federal court. *Kennecott Copper Corp. v. State Tax Comm'n,* 327 U.S. 573, 576–80, 66 S.Ct. 745, 90 L.Ed. 862 (1946). There is no indication in the *Stone* opinion that Arizona intended to consent to anything more than suit in its own courts. *Ronwin v. Shapiro, supra,* 657 F.2d at 1074.

dicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of

the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

■ The Arizona legislature clearly has the power to waive the State's Eleventh Amendment immunity,[7] but the question here is whether it has exercised such power. The legislature has enacted a provision which allows the Board to "sue and be sued." Ariz.Rev.Stat. § 15–724. This statute does not serve to waive an Eleventh Amendment defense, however, since the phrase "sue and be sued" has been limited to waiving immunity in the state, and not the federal courts. *See Ronwin v. State Bar of Ariz.*, 663 F.2d 914, 922 n.10 (9th Cir. 1981); *Soni v. Board of Trustees of Univ. of Tenn.* 513 F.2d 347, 352–53 (6th Cir. 1975) and cases cited therein. The legislature has also enacted a general procedure for bringing contract or negligence suits against the State. Ariz.Rev.Stat. §§ 12–821 to 826. Section 12–821[8] contemplates that as a prerequisite to filing a court action, a "claim" must be filed with and disallowed by the state agency whose action or non-action gave rise to the liability creating event. *State v. Brooks*, 23 Ariz. App. 463, 466–67, 534 P.2d 271 (1975). In this case it appears that this section has not been complied with since plaintiff never presented a claim requesting any form of relief from the Board. However, even if plaintiff had complied fully with § 12–821, at most he would be entitled to proceed in state court. *See Rutledge v. Arizona Bd. of Regents, supra,* 660 F.2d at 1350.

None of the above authorities, either singly or in combination, amount to a clear and express waiver of the Board's Eleventh Amendment immunity. *Markowitz v. United States*, 650 F.2d 205, 206 (9th Cir. 1981); *see McConnell v. Critchlow, supra,* 661 F.2d at 117–118 n.1. Accordingly, this action must be dismissed with respect to the Board. *See Ginter v. State Bar of Nev.*, 625 F.2d 829 (9th Cir. 1980).

■ It should be noted that the courts have drawn a distinction between suits brought directly against the State, which are barred irrespective of the nature of the relief sought, and suits against state officials for equitable or declaratory relief, which are not precluded by the Eleventh Amendment. *See e.g., Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978) (per curiam); *Helfrich v. Pennsylvania,* 660 F.2d 88 (3d Cir. 1981); *Spicer v. Hilton,* 618 F.2d 232, 237 (3d Cir. 1980); *N.A.A.C.P. v. California, supra,* 511 F.Supp. at 1250. Even though the complaint in this case includes a claim for damages, the main thrust of plaintiff's pleadings and evidence at the hearing has been directed toward securing equitable and declaratory relief. Therefore, as to the latter claimed relief, the Court will consider an appropriate motion for leave to amend to add as defendants the individual members of the Board in their official capacities. Fed.R.Civ.P. 15(a); *see Spicer v. Hilton, supra,* 618 F.2d at 237.

## PROCEDURAL DUE PROCESS

Plaintiff maintains that he was issued a terminal contract without being afforded procedural due process guaranteed by the Fourteenth Amendment. His contentions that he has demonstrated protected property and liberty interests will be examined separately.

*Property Interest*

Plaintiff alleges that he has an expectation in continued employment that rises to the level of a constitutionally protected property interest. His basic position is that even though he is not officially tenured, he has *de facto* tenure as a result of certain conduct by university officials. Specifically, plaintiff relies upon a letter from defendant Guido G. Weigend, Dean of the College of Liberal Arts, which promises plaintiff tenure "automatically" in his third year of employment or sooner by mutual convenience.

---

7. The Arizona Constitution provides: "The legislature shall direct by law in what manner and in what court suits may be brought against the State." Art. 4, pt. 2, § 18.

8. Section 12–821 provides: "Persons having claims on contract or for negligence against the state, which have been disallowed, may on the terms and conditions set forth in this article, bring action thereon against the state and prosecute the action to final judgment."

■ To determine whether plaintiff has an expectation in continued employment the Court may look to "rules or understandings" that arise from an independent source, such as state statutes, regulations and express or implied contracts. *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). While state law provides that the Board bears the ultimate responsibility for appointing and employing professors, Ariz.Rev.Stat. § 15–725(A)(2), the Faculty Handbook presented to Professor Harris at the outset of the hiring negotiations states that the President of A.S.U. shall appoint all university personnel and approve all faculty changes, subject to the policies and practices of the Board. (Exhibit 43, ¶ 2.4.1). Provost Mulhollan testified that this power of appointment has been further delegated to him by the President. Thus, the Provost was acting within the scope of his delegated authority when he first wrote on April 23, 1980 to offer plaintiff "an appointment as Professor with tenure." (Exhibit 1).

On April 30, 1980 plaintiff responded that he would prefer to come to A.S.U. on the basis of leave rather than tenure since that status would entitle him to a $2,000 tuition remission for his son. (Exhibit 2). This letter requested confirmation that his "*tenure at Arizona State University will become automatic* beginning in the academic year 1982–1983, or, at our mutual convenience sooner." (Emphasis in original). The Provost replied to this request in his letter of May 6, 1980 by stating that "I have no objection to your preference that tenure not be awarded during your first year or two at Arizona State University but will leave additional recommendation on the matter to the Department of English and the College of Liberal Arts." (Exhibit 3).

On May 13, 1980, defendant Marvin Fisher, Chairman of the Department of English, wrote to plaintiff, apparently to express his "recommendation" as head of the English Department, and took the position that plaintiff would be reviewed for tenure in his second year. (Exhibit 4). The Chairman also noted that "Dean Weigend has corroborated these terms by telephone."

Plaintiff then wrote to the Chairman on May 25, 1980 to object to his being reviewed for tenure and to again request automatic tenure. (Exhibit 5). He argued that there should be no objection to postponing the award of tenure since he had originally been offered tenure by the Provost.

It appears that the Chairman was in England on vacation at this time and that plaintiff telephoned the Chairman's administrative assistant, Gwen Stowe, to discuss the matter with her. She apparently brought the issue to the attention of Dean Weigend, who then on May 27, 1980 issued an "addendum" to the Provost's original offer to plaintiff. (Exhibit 6). This addendum provided that "[t]he initial appointment will not be with tenure, but you will receive tenure automatically beginning in the academic year 1982–83, or sooner at our mutual convenience." Plaintiff finally accepted this offer in a letter to the Provost. (Exhibit 7).

■ In determining whether plaintiff has shown a property interest under these facts the Court acknowledges that the Ninth Circuit recently indicated that with respect to a non-tenured employee "the existence of a formal code governing the granting of tenure precludes a reasonable expectation of continued employment absent extraordinary circumstances." *Haimowitz v. University of Nevada*, 579 F.2d 526, 528 (9th Cir. 1978). Although the facts of the instant case clearly show that A.S.U. has adopted a formal tenure code, the case also involves precisely the "extraordinary circumstances" envisioned in *Haimowitz* that justify plaintiff's belief that he has a reasonable expectation of continued employment. Here the plaintiff rejected both of the available tenure options—tenure at appointment and tenure following a performance review—and insisted instead upon his "singularly unique" preference for automatic tenure. *Id.* at 529. Regardless of the propriety of his motives for seeking automatic tenure, the fact remains that he was successful in securing the written promise of the Dean that he would be granted ten-

ure in three years, or sooner by mutual convenience.

This is not a case in which the professor was unable to obtain a guarantee of future employment from university officials. *See Seitz v. Clark*, 524 F.2d 876 (9th Cir. 1975). Neither is the Court faced with a situation in which the professor relied upon mere oral assurances that he would receive tenure "as a matter of course" if he satisfactorily performed his duties. *See Davis v. Oregon State Univ.*, 591 F.2d 493 (9th Cir. 1978). Rather, this case is like *Soni v. Board of Trustees of Univ. of Tenn., supra*, 513 F.2d 347, where the professor was led to believe that he had been granted a permanent position despite the fact that he had not been formally awarded tenure. *See Haimowitz v. University of Nevada, supra*, 579 F.2d at 529.

Defendants maintain that the Dean was without authority to offer automatic tenure to plaintiff. The Court agrees that the Provost's letter of May 6, 1980 did not delegate express authority to the Dean alone since it suggests a final decision by the Provost after recommendation by the English Department and the College of Liberal Arts. The Court believes, however, that this letter, when coupled with subsequent events, is sufficient to support the conclusion that the Dean was clothed with apparent authority on the issue of plaintiff's tenure. The fact that the Provost did not object to the Chairman's letter of May 13, 1980, wherein the Chairman clearly purported to express the official position of the university, suggests that the Provost would also allow the Dean, a higher university official, to speak on behalf of the university on the matter. This is particularly true here since the Provost indicated in his May 6, 1980 letter that he personally had no objection to granting plaintiff automatic tenure. Even if the Dean was without apparent authority, defendants may not now complain since both the Provost and the Chairman have ratified the offer of automatic tenure by their long period of acquiescence and by their knowing acceptance of the benefits of plaintiff's efforts as

an A.S.U. professor. *See Fuqua Homes, Inc. v. Grosvenor*, 116 Ariz. 424, 569 P.2d 854, 856 (App.1977); *Phoenix Western Holding Corp. v. Gleeson*, 18 Ariz.App. 60, 66, 500 P.2d 320 (1972).

Defendants also argue that the Dean could not promise automatic tenure in three years since the Board's practice is to issue annually a notice of appointment for the next academic year. This argument is unpersuasive since it ignores the fact that tenure, or "stability of employment" as it is referred to in the Faculty Manual, is not granted by the Board, but rather arises from an agreement with university officials that the tenured employee's name will be submitted to the Board for the granting of a new contract each year. The Court is also unable to accept defendants' related argument that the Dean improperly interfered with the Board's ability to "[r]emove any officer or employee when in its judgment the interests of education in the state so require." Ariz.Rev.Stat. § 15-725(A)(4); *see Devol v. Board of Regents*, 6 Ariz. 259, 56 P. 737 (1899). This section should not be interpreted as conflicting with the concepts of tenure or automatic tenure and the Board's removal powers are unimpaired by the Dean's actions.

The practical effect of the Court's ruling that plaintiff has demonstrated an expectation of continued employment as a result of his automatic tenure status is that plaintiff must be treated as if he were presently a tenured professor. Simply because his tenure will become automatic in the academic year 1982-1983, if not sooner, does not grant him any rights beyond those of a tenured professor. At the same time, however, since a proper university official has agreed that he need not be subjected to a tenure review process, plaintiff may not be terminated, by the impetus of university officials, without notice and a hearing at which he would be entitled to the same substantive standards and procedural protections afforded a regularly tenured professor. Anything less would not comport with the due process requirements of the Fourteenth Amendment.

*Liberty Interest*

 Liberty interests are implicated when an individual is discharged for reasons which are sufficiently "stigmatizing" that they seriously damage his standing in the community or significantly foreclose his freedom to take advantage of other employment opportunities. *See, e.g., Board of Regents v. Roth, supra,* 408 U.S. at 573–74, 92 S.Ct. at 2707; *Bollow v. Federal Reserve Bank,* 650 F.2d 1093, 1100–01 (9th Cir. 1981). The reputational damage must occur during the course of the termination of employment, *Paul v. Davis,* 424 U.S. 693, 710, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), and the stigmatizing reasons for the termination must be publicly disclosed. *Bishop v. Wood,* 426 U.S. 341, 348, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1975). The remedy for the deprivation of a liberty interest in this case would be to "accord [plaintiff] an opportunity to refute the charge before University officials" in a proper hearing. *Board of Regents v. Roth, supra,* 408 U.S. at 573, 92 S.Ct. at 2707; *accord Davis v. Oregon State Univ., supra,* 591 F.2d at 496.

 In the present case most of the reasons given for plaintiff's non-renewal relate to his alleged inattention to administrative duties and his purported reluctance to accept the suggestions of other university officials. It is clear that allegations of poor performance or an inability to get along are insufficient to implicate a liberty interest. *See, e.g., Bollow v. Federal Reserve Bank, supra,* 650 F.2d at 1101; *An-Ti Chai v. Michigan Technological Univ., supra,* 493 F.Supp. at 1155. Defendants also admit, however, that plaintiff was issued a terminal contract partly because of his opposition to Rita Dove, a black female, and his alleged failure to follow university affirmative action policies. (Testimony of Chairman Fisher; *see* Exhibit 35). The Court

need not decide whether a charge of insensitivity to minorities may impose a stigma, *see An-Ti Chai v. Michigan Technological Univ., supra,* 493 F.Supp. at 1156, since plaintiff has not shown that such a charge has been disclosed to the public. *See Wooten v. Clifton Forge School Bd.,* 655 F.2d 552, 555 (4th Cir. 1981).

 Plaintiff's termination did receive some publicity in the form of a March 24, 1981 article in the school newspaper, (Exhibit 45), but it cannot be fairly said that the reasons mentioned in this article would serve to stigmatize plaintiff. *See Bunting v. City of Columbia,* 639 F.2d 1090, 1094–95 (4th Cir. 1981). However, plaintiff's "unyielding opposition" to affirmative action and Rita Dove was cited in a May 13, 1981 letter from Chairman Fisher to Professor Richard Stoner, Chairman of the Academic Freedom and Tenure Committee. (Exhibit 30). As noted above, plaintiff presented his dispute to the Academic Freedom and Tenure Committee after he was informed that he would be terminated but before he was officially offered a terminal contract. Under these facts, the Court is inclined to view the letter as a document prepared in the context of a post-termination proceeding instituted by plaintiff. Thus, the letter is not a public disclosure under *Bishop v. Wood, supra,* 426 U.S. at 348, 96 S.Ct. at 2079.[9] *See Marwil v. Baker,* 499 F.Supp. 560, 579 (E.D.Mich.1980).

Even if this case is not directly analogous to *Bishop v. Wood,* the Court is not convinced that the limited disclosure resulting from the letter has seriously damaged plaintiff's community standing or significantly foreclosed his future employment opportunities. The record does not reveal any further disclosure of the substance of the letter and there is no reason to believe that Professor Stoner and the members of his

9. In *Bishop v. Wood, supra,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684, a policeman had been terminated without the benefit of a hearing. The reasons for his termination were disclosed to him in a private meeting and were not made public until they were given in response to discovery requests after suit already had been filed. The Court held that because the

disclosure of the reasons for discharge "was made in the course of a judicial proceeding which did not commence until after petitioner had suffered the injury for which he seeks redress, it surely cannot provide retroactive support for his claim." *Id.* at 348, 96 S.Ct. at 2079.

committee have not respected the confidential nature of the communication. *See Kyles v. Eastern Nebraska Human Services*, 632 F.2d 57, 61–62 (8th Cir. 1980). Similarly, the impact of the letter on plaintiff's future employment prospects is minimized to the extent that plaintiff may reasonably request prospective employers not to contact A.S.U., just as he requested A.S.U. not to contact the University of Pittsburgh. (Testimony of Chairman Fisher); *see Beller v. Middendorf*, 632 F.2d 788, 806–07 (9th Cir. 1980). Under these circumstances, the liberty aspect of plaintiff's due process claim must be dismissed.

### FIRST AMENDMENT CLAIM

▇▇ The Supreme Court has suggested the following approach for analyzing plaintiff's claim that he was terminated for exercising his First Amendment right of free speech. The plaintiff must first show that his conduct falls within the realm of protected speech, *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and that it was a motivating or a substantial factor behind the termination decision. *Mt. Healthy City School Dist. v. Doyle, supra*, 429 U.S. at 287, 97 S.Ct. at 576. If the plaintiff shows these elements, the burden then shifts to the defendant to demonstrate that it would have reached the same decision even in the absence of the constitutionally protected conduct. *Id.* at 285–86, 97 S.Ct. at 575.

▇▇▇ The question of whether a professor's speech is constitutionally protected necessarily entails striking "a balance between the interests of the [professor], as a citizen, in commenting on matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education, supra*, 391 U.S. at 568, 88 S.Ct. at 1734; *see Mt. Healthy City School Dist. v. Doyle, supra*, 429 U.S. at 284, 97 S.Ct. at 574. In

applying this balancing test to the instant case, the Court concludes that plaintiff's opposition to the candidacy of Rita Dove falls outside the scope of protected speech. First, since the substance of the issue was limited to a discussion of the relative qualifications of Ms. Dove for a position in the creative writing program, plaintiff was raising an internal matter not of public concern. *An-Ti Chai v. Michigan Technological Univ., supra*, 493 F.Supp. at 1158. Second, even assuming it was a matter of public concern, the manner in which he chose to express his opinion was reasonably considered by university officials to be so disruptive that it substantially and materially interfered with the effective operation of the creative writing program, if not the entire English Department. (*See* Exhibits 44, 45). Plaintiff's threat to contact Ms. Dove to tell her she would not be welcome in his program was wholly inconsistent with the nature of the academic environment, and served to antagonize and alienate some faculty members. (*See* Exhibits 30, 47). *See also, Mabey v. Reagan* 537 F.2d 1036, 1046–51 (9th Cir. 1976). Under these circumstances, plaintiff's interest in expressing his opinion on the Rita Dove affair was outweighed by the university's interest in avoiding dissension in the English Department. *An-Ti Chai v. Michigan Technological Univ., supra*, 493 F.Supp. at 1158.[10]

### CONCLUSION

The Court concludes that it has § 1331 jurisdiction over the Board and a cause of action is stated under § 1983 since the Board is a § 1983 "person." Nevertheless, the Board must be dismissed as it has not waived its valid sovereign immunity defense.

Plaintiff has demonstrated a property interest in his expectation of continued employment and thus his due process rights were violated in that he was not afforded adequate notice and a hearing before he was issued a terminal contract. Under these circumstances plaintiff may not be

---

**10.** Since plaintiff has not met his burden of showing that he was engaging in protected speech, it is not necessary to consider whether the Rita Dove matter was a substantial factor in his termination or whether he would have been terminated even if the incident had not occurred.

terminated without being afforded the substantive and procedural protections associated with the status of tenure. Plaintiff has not been deprived of a liberty interest, however, as he has not shown that any stigmatizing reason for his termination has been publicly disclosed. His First Amendment claim also fails since he was not engaging in protected speech in opposing the candidacy of Rita Dove.

THEREFORE, IT IS ORDERED vacating the minute entry of June 11, 1981 and the temporary restraining order filed June 15, 1981.

IT IS FURTHER ORDERED dismissing the complaint against the defendant Arizona Board of Regents.

IT IS FURTHER ORDERED granting the preliminary injunction enjoining the defendants Mulhollan, Weigend and Fisher from engaging in any action to remove plaintiff from his position as Professor of English, unless plaintiff is afforded those substantive and procedural protections normally afforded tenured professors in the A.S.U. Department of English.